## SHERBURNE *v.* GOODWIN.

A general release of all demands may operate to discharge debts due to the releasor as executor, although the lease be not signed as such; unless the general words of the release are restrained and limited, by the circumstances, to other demands.

A release under seal is conclusive between the parties, and, when made by an executor, will, in the absence of fraud, bind also the residuary legatees.

In the case of a loan by an executor of trust funds, to a firm of which he is a member, a repayment to him will in general exonerate the firm, although all the partners had notice of the trust character of the funds; and where the executor drew money from the firm from time to time, without stating on what account, but the same was charged in his private account;—*Held*, that a subsequent adjustment and application of money, so drawn, to the payment of money loaned, was valid under the circumstances, even as against the residuary devisees; although the money had been credited to the estate on the books of the firm.

THIS was a bill in equity, brought by the residuary legatees of William Badger, or their representatives, to recover a sum of money belonging to that estate, and loaned by the defendant Coues, one of the executors, to the firm of Goodwin & Coues. The hearing was had upon the bill, answer and proofs, together with the report of a master, appointed to state the facts. The bill, answer, and the master's report sufficiently appear in the opinion of the court.

*Goodall*, for the plaintiff.

*Hackett*, for Goodwin.

BELLOWS, J. The bill charges, substantially, that by the will of William Badger the sum of $1,000 was directed to be invested by his executors—one of whom is the defendant Coues, the other having long since deceased—and the income paid to Frances Fernald during her life, at her decease the same to go to his residuary legatees, the children of his son William and daughter Hepsabeth, who are represented by these plaintiffs; that after the death of the other executor, Joseph Sherburne, the said Coues took into his own possession said $1,000, and put it into the hands and custody of the firm of Goodwin & Coues, these defendants, by whom it was entered to the credit of the estate of William Badger on the books of the partnership; that it was well known by both partners to be the funds of said estate, and not the individual property of said Coues, and was so kept and treated by them; that said Frances Fernald died in 1858; that the firm of Goodwin & Coues was dissolved January 1, 1851, and that the said Goodwin has ever since kept the money, having paid the interest thereon to said Frances during her life, but has otherwise accounted for no part of said sum.

The answer of Goodwin, the bill being taken *pro confesso* as to Coues, admits the bequest for the use of Frances Fernald, but denies that Coues ever put into the hands of Goodwin & Coues the said trust fund of one thousand dollars, or any other sum; or that the firm ever undertook to hold said $1,000, or any other sum in trust; or that said Coues ever had any authority in behalf of said firm, to enter into any such undertaking; or that the firm had

any knowledge of the trust duties devolved upon said executors, or that said Coues ever undertook, or had any authority to make the said Goodwin a party to any such trust. But his answer admits that said Coues placed the money, as it was received from time to time, upon the books of said firm, to the credit of the estate of William Badger upon an interest account, for the purpose, as said Goodwin understood from said Coues, of keeping the proceeds together in one body, and to remain on interest account only until a favorable opportunity to invest the same should occur; that the money was received at different times during five years, and entered by said Coues, without the knowledge of said Goodwin other than the information he had that a sum belonging to this estate was being received, to be invested, when a favorable opportunity should occur to said Coues, who at all times had the entire control of the money.

The answer admits that he at some time became aware that said Coues was under obligation to pay a sum of money to said Frances; but denies that he knew, until long after the money was withdrawn, that said money, or any other money belonging to the estate of William Badger, was subject to any trust, or was claimed by the plaintiffs, or either of them. Nor did he alone, or with said Coues, assume any trust duties with regard to said money, or any other duty or liability, except what was incident to an ordinary debt; that said Coues deposited and withdrew said money, as, and when he chose; and that before the first day of January, 1851, when said copartnership was dissolved, said Coues had withdrawn said money, and all his share of the capital stock of said copartnership; and he utterly denies that he retained said money, or any part thereof, after said firm was dissolved.

The answer further states, that after the withdrawal of said money the said Frances became alarmed for the safety of her annuity, and demanded security of said Coues therefor, and at his request the said Goodwin and one Spalding became sureties for him on a bond to said Frances for said annuity, and were obliged to pay; for which said Coues is still liable to them.

The answer also sets up the statute of limitations.

The master's report finds that the $1,000 was received by Coues, at different times from October 7, 1842, to July 26, 1847, and, as received, placed by him among the funds of the firm, and used by it in the prosecution of the partnership business, and entered on their books to the credit of the estate of William Badger; and the master finds that when the money was so placed in the hands of the firm there was no understanding or agreement between the parties that the firm, or Goodwin, was to assume any liability on account of the money, or any relation to it other than such as would be incident to an ordinary loan on interest; although Goodwin understood, when the sums were received, that Coues held it as executor of Badger's will, and that the interest was to be paid to Fanny Fernald annually, during her life, in which he acquiesced, instead of carrying it to the credit of Coues on his general account; but there was no agreement or privity between him and said Fanny

Fernald in reference to such payment, until the execution of the bond of Coues and others, of May 22, 1848.

It also appeared from the report that Coues had been accustomed to hold funds as executor or trustee in other cases, and that the funds were credited to the estates represented by him on the books of Goodwin and Coues, as in this case, partly for the convenience of Coues in keeping the accounts, and partly for the purpose of indicating that such moneys were not advanced by him as permanent investments, but as loans on interest, subject to be withdrawn when required for the purposes of the trust.

It also appeared from the report, that on the 22d day of May, 1848, the said Fanny Fernald becoming dissatisfied with the management of Coues, and desiring some security, Coues executed a bond, with Goodwin and Spalding as his sureties, to secure the payment of the annual interest to Fanny Fernald; the said Goodwin having objected to Coues withdrawing the money, because of the large amount Coues had withdrawn from the firm on his private account, of which he complained, and preferring an arrangement by way of bond. At the time of giving this bond Coues had withdrawn from the firm an amount greater than his share of the capital and profits, including the $1,000, and from that time he remained a debtor to the firm until its dissolution, January 1, 1851, and until the settlement between the partners, May 8, 1857. At that time a settlement was effected between the said Goodwin and the said Coues, who acted by his attorneys, the result of which was that Coues was to pay to Goodwin six thousand dollars in full of all claims, except payments made for Coues' liability as executor, or trustee, under the will of Mr. Badger; and that mutual releases should be made of all claims, individual and copartnership; and thereupon the payment of the $6,000 was secured, and the releases executed, although the master finds that a sum larger than $6,000 was actually due to Goodwin. He further finds that in negotiating this settlement the attorneys of Coues had access to the partnership books and papers, but did not understand that the $1,000 was a credit to Coues, but that Goodwin did so understand and consider it.

The release of Coues of May 8, 1857, is under seal, signed by Coues himself, in his individual capacity, and not as executor or trustee, and releases and discharges all claims and demands, suits and causes of suits, of every name and nature, whether arising out of said copartnership business or otherwise, intending it to be a full and general release of all demands, whatever may have been their origin, up to that date. The release of Goodwin is in the same terms, with a provision that it shall not affect any claim for any payment made for said Coues' liabilities as executor or trustee under the will of the late William Badger. The substance of the adjustment seems to have been, that although a sum greater than $6,000 was in fact due to Goodwin, even with the $1,000 placed to Coues' credit, it was agreed that $6,000 should be received in full discharge — Coues' attorneys not understanding that the $1,000 was included, but Goodwin understanding that it was included.

The question then arises as to the effect of the release. That

Coues had the right to discharge Goodwin from this claim does not appear to be seriously contested; and we do not perceive any ground upon which it could be; inasmuch as he was entitled to the fund as executor or trustee, and it does not appear that Goodwin had assumed any relations to that fund, in respect to the heirs of Badger, that would entitle him to hold it against Coues.

The will of William Badger, among other things, gives to Fanny Fernald the interest or income of $1,000 during her life, and while single, to be invested by his executors in bank stock or public funds, and the dividends or profits thereof to be paid to her by his 'executors; and gives the rest and residue of his estate to the complainants. Whatever connection there was between Goodwin and Fanny Fernald, in relation to this fund, grew out of the bond signed by him as Coues' surety; and upon her death, which took place before the adjustment in question, Goodwin appears to have been under no liability in respect to it, except his liability to account for it as an ordinary debt, to the executor of Badger's estate. The fact that he knew what was the general character of the fund would not, in the absence of any fraud or privity with the residuary legatees, affect the validity of his paying or accounting for the money to the executor, and the question must turn, therefore, upon the construction of the release. That was given, as appears in the recital, upon the adjustment of all matters connected with or growing out of the copartnership, and all individual claims; and it releases him from all further accounting, and of and from "all and all manner of claims and demands, suits and causes of suits, which I have or ought to have against said Goodwin, of every name and nature, whether arising out of said copartnership business or otherwise; intending this to be a full and general release of all demands, whatever may have been their origin or nature, up to this date." The money in question, deposited with the firm by Coues, came within the terms of the release as well as the general scope of the adjustment, unless affected by the fact that it was not held in his own right, but as executor of William Badger. It will be observed, however, that in cases of this sort, where the cause of action arises after the death of the testator, or intestate, a suit at law for the recovery of the money, where it could be maintained at all, might be in the name of the executor in his own right; and although he might, at his election, sue as executor, yet in respect to costs, set-off, and other purposes, it would be treated substantially as a suit in his own right, and the form of the action would be regarded as immaterial. *Colby* v. *Colby*, 2 N. H. 419; *Woodman* v. *Barker*, 2 N. H. 479; where it was held that a claim against the testator was not a mutual debt within the law of set-off, although the suit were brought as executor. So in respect to costs and execution, as in *Moulton* v. *Wendell*, 37 N. H. 406. In this case no suit at law could have been maintained by any one; but on a bill in equity by one of the partners, for the purpose of adjusting its concerns, there would seem to be no objection to including in the account the money in question, as a credit to Coues; even although the suit might have been brought in his own right alone. Had the money been loaned by

him to Goodwin instead of the firm, Coues clearly could have sued for it, without naming himself as executor; and no good reason is perceived why, in a suit in equity, in which an accounting should be decreed, the money in question should not be credited to Coues.

That in such cases, where a suit at law can be maintained at all, the executor may sue in his own right, the authorities are very clear. 1 Ch. Pl. 203, 204; *Shipman* v. *Thompson,* Willes 103; *Colby* v. *Colby,* 2 N. H. 419; *Woodman* v. *Barker,* 2 N. H. 479; *Shaw* v. *Gookin,* 7 N. H. 16; *Moulton* v. *Wendell,* 37 N. H. 406. In this case it appears from the master's report that prior to the settlement in question a bill in equity had been brought by Goodwin for the adjustment of the partnership accounts, which was still pending at the time of such settlement; and as we have before seen, in any accounting in that suit the said Coues would have been entitled to credit himself with the money in question. The adjustment embraced all matters growing out of the copartnership, and all individual claims, and the release, in terms, embraced all such claims and demands, and all suits and causes of suits arising therefrom.

The release of Coues is not signed as executor, and does not expressly and in terms embrace claims in his representative capacity; but those claims being such as he might enforce by suit in his own right, he might, as it would seem, also in his own name, release them.

It has ever been laid down as a general proposition, that if a man release all actions, it shall extend as well to actions which he has as executor as those in his own right; Bac. Ab., Tit. Release, E. & J., citing 39 E., 3, 26; 2 Roll. Ab. 414; though it is said that in some cases the general words may, according to the intention of the parties, be restrained. In 2 Lord Raymond 1307, *Powell,* J., in speaking of this general proposition says that it is clearly so, unless there was an action of his own for the release to work upon. So it is held that a release to A and B of all actions, is a release of all such several actions which the releasor has against them, as well as the joint actions. Bac. Ab., Release, L, citing 1 Ld. Raym. 235. So it is said that if the husband release all demands, he releases a debt to his wife before coverture, as he only can demand it; otherwise of all actions. Dane Ab., ch. 167, art. 6, sec. 3, citing *Miles* v. *Williams,* 10 Mod. 160. The general words of the release, however, may be limited to particular demands, where it appears, by the consideration, by the recital, or by the nature and circumstances of the several demands, that they were intended so to be limited. *Thorpe* v. *Thorpe,* 1 Ld. Raym. 235; 2 Roll. Ab. 409, a, 1; *Taylor* v. *Homersham,* 4 M. & S. 423; *Rich* v. *Lord,* 18 Pick. 322; *Averill* v. *Lyman,* 18 Pick. 346. And upon the other hand it would seem that such general words might be enlarged in a similar way, when read in the light of surrounding circumstances. In the case before us, it is shown by the master's report that Goodwin did, and Coues' agent did not, understand that the money in question was included in the adjustment. But however this fact may be, it is clearly not

admissible to affect the construction of the release, which, unlike a mere receipt not under seal, can not be controlled by parol evidence of the intention of the parties. Indeed, a release, by its own operation, extinguishes a preëxisting right, and can not be controlled or explained by parol. Chit. on Con. 792; *Butcher* v. *Butcher*, 1 B. & P. (N. R.) 113; *Brooks* v. *Stuart*, 9 A. & E. 854; *Pierson* v. *Hooker*, 3 Johns. 68; *Stearns* v. *Tappin*, 5 Duer 296. A release, therefore, shall be held to include all demands embraced by its terms, whether particularly contemplated or not; and parol evidence is not admissible to show that a certain claim was not in the minds of the parties. *Deland* v. *Amesbury M. Co.*, 7 Pick. 244; *Hyde* v. *Baldwin*, 17 Pick. 303, 307. In giving a construction to the release, then, this parol evidence must be laid out of the case; although, like other written instruments, it may be construed in the light of surrounding circumstances. In that view the relations between the parties, the nature and character of the existing disputes, the actions then pending, and the subject matter of them, and the claims to be investigated and passed upon, may all be considered in determining the construction of the release.

Examined in this light, and understanding that the accounting which was sought by the bill in equity would embrace the money in question, we are brought to the conclusion that the general words of the release are not only not restrained, but that in giving them full effect, so as to embrace the matter in controversy, the actual intention of the parties, as gathered from the instrument, read in the light of the attending circumstances, is accomplished. But it is said that the release of Goodwin to Coues justifies the inference that this money was not taken into the settlement. That release was like the other, with the further provision that it should not affect Goodwin's claim for any payment made for said Coues' liability as executor or trustee, under Badger's will. It appears, however, that as a surety on the bond to Fanny Fernald, Goodwin had paid interest to her, to the amount of several hundred dollars, after the dissolution of the firm; and to that sum the provision under consideration would clearly apply, and this would be consistent with the construction we put upon Coues' release. To hold that it extended also to future payments on account of the principal sum, would be to assume that Goodwin & Coues, as partners, were still answerable to the legatees for the amount, and that as between the partners, Coues was bound to pay either one half or the whole. Without adverting to the allegations in the bill, to the effect that the whole money was left with Goodwin at the dissolution of the firm, and that he still retains it, it is sufficient to say that such an assumption is not, as we think, consistent with the release of Coues, nor with the purpose to adjust the affairs of the partnership. On the other hand, the terms of that provision are rather applicable to claims for payments already made; and had it been intended to include payments to be made in future, we should naturally have expected in Coues' release, a provision for it, especially as its terms are broad enough to exclude any such idea.

It is contended, indeed, that unless this exception applies to future

payments there is nothing for it to work upon, for the reason that the money was left in Goodwin's hands upon interest account; and, therefore, in paying interest, he was only paying what was due from him.

This suggestion, although plausible and ingenious, overlooks the circumstance that it assumes the very fact in controversy, namely, that the money was left in Goodwin's hands; whereas the master's report finds that, at the dissolution of the firm, Coues had drawn from it to such extent as to be indebted to it several thousand dollars. It is true it does not appear that this fund was specifically drawn out, but it being under his control, it might well be considered as included in the sums drawn out by him, but without special designation.

It is urged also for the plaintiffs that if the terms of the release are such as to include this fund, it is a mistake, and that the release should be reformed. But independent of the question whether any such mistake is shown as would entitle the party to this sort of relief, it is quite clear that it could be granted only upon proceedings instituted for that purpose, and under such circumstances as would enable the court to do justice to both parties, and not by simply excluding from the effect of the release the particular demand, and thus evading the rule that prohibits the introduction of parol evidence to contradict a written instrument. In this case the contract has been executed, in accordance with its provisions, as understood by Goodwin, and it would be preposterous to allow Coues to retain the benefits of it on his part, and still allow him to change it in a material point to the prejudice of Goodwin, who acted upon the belief that the release, as drawn, was correct. *Blackmer* v. *Hall*, 12 Vt. 377. Beside, we do not consider that any such evidence of mistake, in drawing the releases, is shown, as would entitle the party to a reformation of the instrument; but it is rather a case where the parties agreed upon a certain sum by way of compromise, to be paid in full discharge of all demands on both sides, without undertaking to find the exact balance; but each party taking the risk of loss from the omission to bring forward all claims. In such cases a party is not entitled to relief upon the ground of mistake, in the absence of fraud. *Blackmer* v. *Wright*, 12 Vt. 377; *Holbrook* v. *Blodgett*, 5 Vt. 526.

The opinion of the court, then, is, that the release of Coues must be construed to embrace his claim for this trust fund, which, with all other claims arising out of the copartnership, must be regarded as adjusted and discharged.

It is urged by the plaintiffs' counsel that although the release may be conclusive as to Coues, it is not so as to these complainants; and this is undoubtedly true, so far as respects any question of fraud that might arise; but in the absence of fraud Coues must be regarded as the representative of these complainants, who, therefore, as privies, are equally bound.

But it is further contended that this money was held by Goodwin, knowing that it was a trust fund, and that this application of it in the adjustment of the partnership concerns was a breach of trust,

in which Goodwin participated, and, therefore, as to the plaintiffs, was fraudulent and void.

On this point it appears that the money was loaned by Coues to the firm of Goodwin & Coues for a temporary purpose, to be withdrawn at any time at his pleasure. The legal title to the money was in him, and for many, if not for most purposes, he was to be regarded as the owner; and he alone could demand and sue for it, unless under circumstances which showed a *devastavit*. Under all ordinary circumstances he could withdraw the money at his pleasure, and it would be a strong case that would render a payment to him invalid, and subject the firm to claims of creditors or legatees. If, however, the intention to misapply it existed, and that was known to Goodwin, such a payment might be regarded as fraudulent and collusive, and the firm still chargeable at the suit of the creditors or legatees; especially in a case where the executor was irresponsible, and such creditors and legatees had no other remedy. But generally, and under the circumstances of this case, this executor might properly be regarded as the owner of the fund, so that a *bonâ fide* payment to him would wholly exonerate the firm. 1 Story Eq., sec. 579; *Hill* v. *Simpson,* 7 Ves. 166; *Mead* v. *Lord Orrery,* 3 Atk. 239.

But it is urged that the money was entered upon the books of the firm as a credit to the estate of William Badger, and that thereby a different relation was created; but this arrangement appears by the master's finding to have been merely for the convenience of keeping the account by Coues, and to indicate that the money was not a permanent investment, but that it was subject to be withdrawn by Coues whenever it was wanted, without regard to the convenience of the firm; and that in fact the firm assumed no relation to this fund, or liability to account for it, other than such as are incident to an ordinary debt. It appears that the money was deposited with the firm at different times from October 7, 1842, to July 26, 1847, but chiefly in the early part of that period, $600 of it having been deposited October 7, 1842. Under these circumstances, and before May 22, 1848, Coues had drawn from the firm an amount, in all, greater than his share of the capital invested and the profits, including, also, the $1000 in question; and the amount so withdrawn was carried to his private account; the sums credited to the estate of William Badger not having been specifically or in terms withdrawn, so that the true state of the case seems to be this: That large sums of money were drawn from the firm by Coues, from time to time, and during the time he was so drawing, his claims to do it, so far as appears, were limited to his share of the profits and of the capital stock, and for the money in question loaned by him as executor. The money thus drawn was charged in his private account, but otherwise there was no designation of the claim upon which it was drawn, whether on account of profits, capital stock or the loan in question. For aught that appears, he would at some time have been entitled to draw for the profits and capital stock, and there is nothing in the case that goes to interfere with his right to withdraw the loan at any time he pleased; nor is this right seriously contested by the plaintiff's counsel. In point of fact, Coues

drew a greater sum by more than six thousand dollars than the whole amount of his share of the profits, and capital, and loan combined. And the question then is, whether a subsequent application of the excess so drawn, beyond the profits and capital, to the payment of the money so loaned, would be evidence of a fraudulent and collusive misapplication of the fund.

In an equitable point of view the money so drawn by Coues should be regarded as drawn on account of such claims as he then had, notwithstanding it was all carried to his private account, that being a convenient and ordinary method of proceeding until the moneys could be adjusted and specially applied; and, for aught we can see in this case, the application might well be made, after discharging the other claims, to the loan in question. But it is urged by the plaintiff's counsel that it does not appear when the money was so withdrawn; and it is true that the dates are not given, except the master states that as early as May 22, 1848, Coues had withdrawn a sum greater than his share of the profits, capital stock, and this loan, and we think it safe to assume that the withdrawals were continued during the existence of the loan, although the counsel suggests that it commenced long before the loan was made. If this is not so, the books will readily show.

Was, then, the application of May 8, 1857, such as to be valid against these plaintiffs. Upon this subject there has been some fluctuation in the authorities, it having been formerly held by the most eminent judges, including Lord *Hardwicke* and Lord *Mansfield*, that, in relation to the personal assets of the deceased, the executor is to be deemed so far the owner that he may sell or pledge them to pay or secure his private debt. But the better opinion seems now to be, that although for many, if not for most purposes, the executor may be dealt with as absolute owner of the assets, yet the person dealing with him should not wholly overlook his character as trustee, when he knows that the executor is applying the funds to a purpose foreign to the trust, and therefore an application of the assets to pay or secure the executor's private debt, the creditor knowing the character of the assets, would be regarded as fraudulent and collusive, unless the fraud and collusion was repelled by the circumstances. *Hill* v. *Simpson*, 7 Ves. 166; *Vield* v. *Schiefflin*, 7 Johns. 150; 1 Story Eq., sec. 580, and cases cited; *Kearne* v. *Roberts*, 4 Mad. 357. But to enable the creditors and legatees to follow the assets into the hands of a purchaser, there must have been a breach of trust in the executor amounting to a *devastavit*, in which such purchaser knowingly participated. See cases above cited, and also *Yaner* v. *Ivie*, 2 Ves. 466; *Whale* v. *Booth*, cited in 4 T. R. 620; 1 Story Eq., sec. 421. So the mere fact of notice that the assets belong to an unsettled estate will not charge the purchaser, unless he has knowledge of the executor's purpose to be guilty of a breach of trust; because such disposition may be in the line of his duty, and a person dealing with him may safely assume it to be so, unless upon the face of the transaction the contrary appears; as if they be used to pay or secure his private debt, or for other purposes. In this respect it differs essentially from ordinary

trusts, where the title to real estate is held for another without the power of sale; in which case a purchase with notice of the trust would be fraudulent in respect to the *cestui que trust;* 1 Story Eq. Jur., sec. 580; *Mead* v. *Lord Orrery*, 3 Atk. 238, 239, 240.

The general doctrine is well laid down by Sir John *Leach* in *Kearne* v. *Roberts*, 4 Mad. 357, 358. "Every person, he says, who acquires personal assets by a breach of trust, or a *devastavit*, by the executor, is responsible to those who are entitled under the will, if he is a party to such breach of trust. Generally speaking, he does not become a party to a breach of trust, by buying or receiving as a pledge for money advanced at the time, any part of the personal assets, whether specifically given by the will or otherwise, because this sale or pledge is held to be *primâ facie* consistent with the duties of an executor. Generally speaking, he does become a party to the breach of trust by buying or receiving in pledge any part of the personal assets, not for money advanced at the time, but in satisfaction of his private debt, because this sale or pledge is *primâ facie* inconsistent with the duty of an executor. I preface both of these propositions with the term 'generally speaking,' because they both seem to admit of exceptions."

This statement of the doctrine is highly approved by *Story*, J., in Eq. Jur., sec. 581, and such is the doctrine of *McLeod* v. *Drummond*, 17 Ves. 352; and same case, on appeal, 17 Ves. 152.

The result is, that unless there be fraud or collusion in the purchaser, he may safely buy of the executor as the owner of the assets. See 1 Story Eq., sec. 579; *Hill* v. *Simpson*, 7 Ves. 152.

Among the grounds most strenuously urged for the plaintiffs, as a reason for holding that there was no connection between the drawing of the money in the manner stated, and the loan in question, and that the money so loaned should be regarded as entirely independent of the sums drawn out, are these; that the money was credited to the estate of William Badger; that none of the checks were drawn for this specific account, or the amount credited there; and that after Coues had drawn as he had, this account was still left open and unsettled, and so treated in the statement of the affairs of the firm by Goodwin; and that when the bond was given to Fanny Fernald, it was assumed that the money so loaned was still in the hands of the firm.

But after a careful consideration of these positions, we think that, taking into consideration all the circumstances of the case, the evidence falls short of establishing the fact of fraud and collusion in Goodwin, in effecting a misapplication of the assets in question, especially as the responsibility of the executor, aided by his sureties, is not brought in question. The purpose of the entry to the credit of the estate makes it perfectly consistent with the idea of a mere temporary loan of Coues and subject to be withdrawn at his pleasure, as is the effect of the master's finding. The fact that this money was not specifically drawn out, may have some tendency to prove a design that it should remain in the hands of the firm on its responsibility to the estate, but with the finding of the master as to the object of so entering the money, its weight is greatly dimin-

ished.  So, also, as to the statement of the condition of the firm, as shown by the trial balance annexed to said Goodwin's bill in equity, in which the entry of the money in question was included as it stood upon the books.   This being before the accounts were finally adjusted, and the moneys drawn out by Coues were actually applied, does not materially conflict with the views we have taken, namely, that Coues had drawn all that he had a right to draw on account of his share of the profits, capital, and loan in question; and although it was entered generally to his private account, without further designation, yet a subsequent application to the account in question could not be considered as inequitable, or fraudulent in respect to these complainants.

The giving of the bond in May, 1848, is not entitled to the weight which is claimed for it by the plaintiff's counsel.  It is true that Goodwin objected to Coues drawing out this money, for the reason that he had already drawn such large sums, preferring to make security by way of bond; but it will be observed that the bond was that of Coues as principal and Goodwin and another as sureties; not recognizing the money as owing by the firm to the estate; and it not appearing at this time that the said Coues was otherwise than in good credit.

Upon the whole evidence we are not able to find a misapplication of these funds attended with a fraudulent breach of trust, in which the defendant Goodwin participated; and without that, these complainants are not entitled to the relief they seek.

*Bill dismissed.*